# UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JOHN S. LINDSEY**                                    **CIVIL ACTION**

**versus**                                            **NO. 10-4502**

**N. BURL CAIN, WARDEN, LSP**                         **SECTION: "B" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  <u>See</u> 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, John S. Lindsey, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On December 14, 2005, he was convicted under state law of attempted creation or operation of a clandestine laboratory for the unlawful manufacture of methamphetamine (Count 1), attempted possession with intent to distribute methamphetamine

(Count 2), conspiracy to produce and manufacture methamphetamine (Count 3), and possession of twelve grams or more of ephedrine, pseudoephedrine, or phenylpropanolamine or their salts, optical isomers, and salts of optical isomers (Count 4).[1]  On December 22, 2005, he was sentenced as follows:   seven years on Count 1; ten years on Count 2; ten years without the benefit of parole on Count 3; and two years on Count 4.  It was ordered that those sentences run concurrently.[2]  On April 10, 2006, he was found to be a multiple offender and was resentenced as such on Count 2 to a term of life imprisonment without the benefit of parole, probation, or suspension of sentence.[3]  On February 9, 2007, the Louisiana First Circuit Court of Appeal affirmed petitioner's convictions, habitual offender adjudication, and sentences.[4]  The Louisiana Supreme Court then denied petitioner's related writ application on October 12, 2007.[5]

After seeking and being denied post-conviction relief in the state courts, petitioner filed the instant application for *habeas corpus* relief on December 1, 2010.  In support of his application, he asserts the following claims:

---

[1] State Rec., Vol. IV of X, transcript of December 14, 2005, pp. 173-74; State Rec., Vol. I of X, minute entry dated December 14, 2005; State Rec., Vol. I of X, jury verdict form.

[2] State Rec., Vol. V of X, transcript of December 22, 2005; State Rec., Vol. I of X, minute entry dated December 22, 2005.

[3] State Rec., Vol. IV of X, transcript of April 10, 2006; State Rec., Vol. I of X, minute entry dated April 10, 2006.

[4] State v. Lindsey, No. 2006 KA 1102, 2007 WL 437677 (La. App. 1st Cir. Feb. 9, 2007); State Rec., Vol. IX of X.  On March 28, 2007, the court also denied petitioner's application for rehearing. State Rec., Vol. VII of X.

[5] State v. Lindsey, 965 So.2d 397 (La. 2007) (No. 2007-KO-0453); State Rec., Vol. X of X.

1.      The prosecution failed to disclose evidence to the defense as
        required by Brady v. Maryland, 373 U.S. 83 (1963), and its
        progeny;

2.      There was insufficient evidence to support petitioner's
        convictions;

3.      Petitioner received ineffective assistance of counsel at trial
        and in the habitual offender proceedings;[6]

4.      Petitioner was subjected to an illegal search and seizure; and

5.      Petitioner's appellate rights were abridged.

The state concedes that petitioner's application is timely and that he has exhausted
his state court remedies with respect to those claims.[7]

Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")
comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.
Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of
fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal
habeas court's role in reviewing state prisoner applications in order to prevent federal habeas

---

[6] In his federal application, this was listed as Claims 3 and 6.  However, in that both claims assert
a Sixth Amendment violation, they will be considered together in this opinion.

[7] Rec. Doc. 25, p. 3.

–  3  –

'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."
Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law or mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme

– 4 –

Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and footnotes omitted), cert. denied, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways.  First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case.  Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this inquiry "is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694; see also Puckett v. Epps, No. 09-70032, 2011 WL 1891207, at *5 (5th Cir. May 19, 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court recently held:

[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added).

<u>Facts</u>

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

On or about April 27, 2004, sometime after 2:00 p.m., Detective Liberto and Deputy Bulloch (both of the St. Tammany Parish Sheriff's Office at the time of the offenses) were conducting traffic stops near the Cause Boulevard and I-10 intersection in Slidell, Louisiana. As Deputy Bulloch conducted one of the traffic stops, a white male approached Detective Liberto. Based on the complaint made by this anonymous source, the officers conducted a drive-through surveillance of the Slidell Plaza Inn, located at 1662 Cause Boulevard. The officers observed a pizza deliverer approach Room 130 of the motel. A white female answered the door and made eye contact with the officers during the pizza transaction. She abruptly completed the transaction and closed the room door.

Detective Liberto beckoned the pizza deliverer and questioned him regarding the occupants of the motel room. Based on statements made by the pizza deliverer and the prior statements of the anonymous tipster, the officers knocked on the door of Room 130.

A female occupant, who spoke through the closed door, asked who was at the door. The officers responded, "Sheriff's Office." At that point, the female occupant inquired as to the purpose of the visit. The officers responded, "We just want to talk." The female occupant then stated, "If you want to talk to me, you're going to need a search warrant." The officers continued to engage in conversation with the female occupant. They inquired as to whether there were any other occupants in the room. She initially responded negatively and then said yes. The officers asked the occupant if she could "crack the door open." The occupant complied, but affixed the chain lock on the door.

The officers asked the occupant to pass her identification and the identification of any other occupants through the opening. The female produced two pieces of identification. Based on the pieces of identification, the officers believed the room to be occupied by Candida Lane and Larry Lynn Tucker (later determined to be Stacy Ladner and the defendant). The officers were able to briefly observe the other occupant (initially described as a large white male) as he stood in the room with a blanket pulled over his back and draped over his head. The officers ran the identifications and discovered an outstanding arrest warrant for Tucker. The officers confirmed the warrant as valid and active. They informed their supervisor, Sergeant Sharp, of the situation. They were instructed to execute the warrant.

Upon Sergeant Sharp's immediate arrival at the scene, the officers used bolt cutters to release the door chain and gain entrance of the room. Upon entry, the officers secured the occupants and observed several items in plain view including a digital scale, butane torches, pseudoephedrine blister packs, and glass smoking pipes. Based on their training and experience, the officers associated the items with methamphetamine production and consumption. The subject identified to the officers as Larry Lynn Tucker (the defendant) was lying in the bed located at the far end of the room (from the entrance) and was apparently sick (he was vomiting). He advised the officers that he was suffering from a spider bite. The officers placed the defendant under arrest and summoned an ambulance. The defendant was taken to Northshore Regional Medical Center for medical attention. Deputy Bulloch rode in the ambulance with the defendant while Detective Liberto sought and obtained a search warrant for the motel room.

While the search warrant was executed, Deputy Bulloch remained at the hospital with the defendant whose true identity unfolded during his hospital stay. Upon discharge, defendant was

transported to jail and Deputy Bulloch returned to the scene. Captain Tyrney and Lieutenant Hart, commanders of the Narcotics Division, observed a 1995 gray Chevrolet pickup truck backed into the parking space located just in front of Room 130. The officers observed elements in open view in a toolbox located in the bed of the truck and suspected the presence of a mobile methamphetamine laboratory. At the time of Deputy Bulloch's arrival, the officers were seeking (and ultimately received) a search warrant for the vehicle.

Upon execution of the warrant for the motel room, several items were seized as evidence including the aforementioned items, a Gatorade container containing over twelve hundred pseudoephedrine tablets, paperwork with the defendant's and Ladner's actual names on it, mail addressed to the defendant, mail addressed to Ladner, gloves, a voice changer, sandwich bags, a white funnel, aluminum foil, a Sprint palm pilot, binoculars, a blue covered pan, a Sprint cellular phone, a twenty-five round magazine for an Uzi, a five hundred fifty-six millimeter full-metal jacket round, a High Times magazine containing references to illicit drugs, three thirty-round magazines, a Colt AR-15 firearm with a scope, an Uzi, a smoking apparatus, blister packs of pseudoephedrine MSM powder, a glass vial with a white residue, a candy container with suspected illegal narcotics, and a plastic baggie with suspected illegal narcotics. Several items were seized from the truck, including the toolbox (it contained bottled liquid substances, bore the defendant's initials, and was located in the bed of the pickup truck), a military-type grenade, four Motorola police-type radios, a stun gun, a revolver, and a knife. The contents of some items were later tested by the St. Tammany Parish Sheriff's Office Crime Laboratory. According to the scientific analysis report, in pertinent part, an orange plastic container of numerous round white tablets was determined to contain pseudoephedrine, a metal "sour candy" tin containing residue was determined to contain methamphetamine, a glass vial containing residue was determined to contain methamphetamine, and a clear plastic Ziploc bag containing gleanings of green vegetable material was determined to contain marijuana.[8]

---

[8] Lindsey, 2007 WL 437677, at *1-3; State Rec., Vol. IX of X.

<u>Brady Claim</u>

Petitioner's first claim is that the prosecution failed to disclose evidence to the defense as required by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.  This claim was rejected by the state courts,[9] and the AEDPA places severe limitations on this Court's review of a such a claim.  The United States Fifth Circuit Court of Appeals has cautioned:

> Under AEDPA, [a federal court] do[es] not decide *de novo* whether a state prisoner has sufficiently proven a <u>Brady</u> violation. <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a de novo matter."); <u>Neal v. Puckett</u>, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect.").  Rather, [a federal court] decide[s] whether the state court's <u>Brady</u> determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law.  <u>Busby v. Dretke</u>, 359 F.3d 708, 717 (5th Cir. 2004).

<u>Dickson v. Quarterman</u>, 462 F.3d 470, 477-78 (5th Cir. 2006).  For the following reasons, it is evident that high bar has not been surmounted in the instant case.

The law regarding <u>Brady</u> claims is clear:

> A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused.  This Court has held that the <u>Brady</u> duty extends to impeachment evidence as well as

---

[9] The state district court denied this claim on February 4, 2009.  State Rec., Vol. X of X, Judgment with Reasons for Judgment dated February 4, 2009.  Petitioner's related writ application was then likewise denied by the Louisiana First Circuit Court of Appeal.  <u>State v. Lindsey</u>, No. 2009 KW 0483 (La. App. 1st Cir. Aug. 17, 2009) (unpublished); State Rec., Vol. X of X.  The Louisiana Supreme Court also denied relief.  <u>State ex rel. Lindsey v. State</u>, 46 So.3d 1258 (La. 2010) (No. 2009-KH-2050); State Rec., Vol. X of X.

> exculpatory evidence, and <u>Brady</u> suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.  Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, although a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The reversal of a conviction is required upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

<u>Youngblood v. West Virginia</u>, 547 U.S. 867, 869-70 (2006) (per curiam) (internal citations and quotation marks omitted).  Therefore, to prevail on a <u>Brady</u> claim, the petitioner "must show that (1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment."  <u>DiLosa v. Cain</u>, 279 F.3d 259, 262-63 (5th Cir. 2002).

        In the instant case, petitioner's rather convoluted claim is that the prosecution failed to disclose the *absence* of evidence, i.e. that it did *not* have in its possession the keys to the truck.[10] He opines that it was the alleged presence of the keys in the hotel room that connected him to the truck where some of the incriminating evidence was discovered.  However, even if the state did not

---

[10] As an initial matter, the Court notes its skepticism that <u>Brady</u> and its progeny require the state to  disclose what evidence it does not have in its possession.  <u>See, e.g.</u>, <u>United States v. National On Leong Chinese Merchants Association</u>, No. 90 CR 760, 1991 WL 30673, at *14 (N.D. Ill. Feb. 15, 1991).  Nevertheless, even if such an obligation perhaps exists in some circumstances, there was no violation here for the reasons noted in this opinion.

in fact find, take, or retain possession of the keys, which has by no means been proven,[11] there was

no <u>Brady</u> violation.

In the instant case, the prosecution met its obligations by providing open-file

discovery, including an opportunity for defense counsel to inspect all physical evidence.[12]  Where,

as here, the prosecution made all of its evidence available for inspection, it simply cannot be argued

that any evidence (or the fact of the lack thereof) was suppressed.  Accordingly, this claim should

be denied.

<u>Sufficiency of the Evidence</u>

Petitioner next claims that there was insufficient evidence to support his convictions.

On direct appeal, the Louisiana First Circuit Court of Appeal rejected that claim, holding:

> [T]he defendant argues that the evidence presented herein was
> insufficient to support the convictions.  He contends that not all
> reasonable hypotheses of innocence were eliminated.  He notes that
> the State had a burden to prove that the defendant knowingly
> possessed items intended to be used to manufacture
> methamphetamine.  The defendant argues that during his trial
> testimony, he gave a reasonable explanation for his presence near the
> items.  He contends that his mere presence is insufficient.  The
> defendant presumes that Larry Ross, the name on the motel room's
> leasing agreement, was responsible for the activities in question.  He

---

[11] Officer Mark Liberto testified under oath at trial that the keys were located inside the hotel room.  State Rec., *Vol. III of X*, transcript of December 13, 2005, pp. 140-41.  On the other hand, petitioner's contrary contention is based on nothing more than his own supposition that the keys were not located in the room because they were not listed on evidence forms or produced at trial. Obviously, the omission from the forms could have resulted from an innocent oversight.  Moreover, the prosecution was not *required* to produce the keys at trial.  Liberto's testimony, if found credible by the jury, was in and of itself sufficient for the jury to find that the keys were found in the room.

[12] State Rec., Vol. I of X, State's Answer to Motions for Discovery and Inspection; State Rec., Vol. II of X, transcript of October 14, 2005, p. 6.

notes that the items seized during the search of the truck were not tested.  The defendant further argues that the items seized, with the exclusion of the Sudafed tablets, were legal.

As to count two, the defendant specifically argues that there was no direct evidence that he was attempting to possess methamphetamine with the intent to distribute.  The defendant argues that the small amount of methamphetamine seized was not prepared for distribution.

As to count three, the defendant specifically argues that there was no evidence of an overt act committed with another individual to manufacture methamphetamine.  He contends that no other person was named.  The defendant argues that there was no evidence of a combination or agreement between the defendant and another person to commit a crime.  He also notes that there was no evidence of who bought the drugs and over what period of time.  The defendant contends that he was unable to notice the items in the room and truck due to his spider bites.

The constitutional standard for testing the sufficiency of evidence, adopted by the Legislature in enacting La. Code Crim. P. art. 821, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).  The Jackson standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.  When analyzing circumstantial evidence, La. R.S. 15:438 provides that the trier of fact must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence.  State v. Graham, 2002-1492, p. 5 (La. App. 1 Cir. 2/14/03), 845 So.2d 416, 420.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness.  State v. Richardson, 459 So.2d 31, 38 (La. App. 1 Cir. 1984).  Moreover, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is of the weight of the evidence, not its sufficiency.  Richardson, 459 So.2d at 38.  On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt.  State v. Creel, 540 So.2d 511, 514 (La. App. 1 Cir. 1989).  When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant

is guilty unless there is another hypothesis that raises a reasonable doubt.  State v. Captville, 448 So.2d 676, 680 (La. 1984).

During the instant trial, State witness Jason Gill presented extensive testimony regarding the creation of a clandestine laboratory for the manufacture of methamphetamine.  Gill, a special agent with the United States Drug Enforcement Administration, was accepted as an expert in clandestine drug laboratory creation and operation.  According to Gill, there are about seven different methods that can be used to manufacture methamphetamine.  One of the most prevalent methods in the United States involves the utilization of iodine and red phosphorus.  This method is commonly used on the West Coast and some northern areas.  The most prevalent method in the Louisiana area is referred to as the "Birch" reaction or the "Nazi" method.  This method requires the use of anhydrous ammonia and is commonly seen in areas where farming activity takes place.  The first step in production is the extraction of a precursor chemical, particularly ephedrine or pseudoephedrine, commonly found in cold medication.

According to Gill, a common way to extract pure pseudoephedrine from tablets is to place the tablets in a grinder to grind them into a powder.  This simply allows for a quicker breakdown of the Sudafed from the tablets.  Thus, one of the common items used in a methamphetamine laboratory is a blender or a grinder.  During the extraction step, the powder and a solvent, commonly ether (or denatured alcohol or isopropyl alcohol and heat), are placed into a vessel and shaken to develop a "biphase" solution.  This results in the creation of a "pill wash" wherein a semi-sludge layer rests at the bottom and a solvent containing pure Sudafed rests at the top (which will later dissolve into the solvent).  Coffee filters, bedspreads, cheesecloths, or any other strainer to strain a very fine powdery substance can be used to extract the pseudoephedrine from the biphase solution.

Gill described the next step as one of the most dangerous parts of the reaction.  A solvent is released into the air in a vapor when the step is performed in an enclosed area with a burner plate and butane torches.  The environment is altered and becomes highly flammable.  Anhydrous ammonia or any water-reactive metal can be used to actually form methamphetamine.  Anhydrous ammonia can be manufactured with sodium hydroxide or Red Devil lye, ammonium nitrate, and a small amount of water.  That chemical reaction forms a gas.  Items needed during this reaction include a vessel, plastic tubing, a metal container, and a metal pipe.  The three

types of metal that can be used are lithium, sodium, or potassium. Lithium metal is commonly found in batteries. Gill further testified the presence of propane tanks and evident discoloration on the brass fitting on top of a container (brass has a very violent reaction to anhydrous ammonia) are two instant hints to the existence of a methamphetamine lab. When the reaction gets near the stage of completion, it turns into a porridge-looking oatmeal substance, methamphetamine base. The substance must be processed into a usable form to allow it to be dissolved into the body. In the final stage, a non-water solvent is added to the porridge-like substance (commonly starting fluid). The introduction of hydrogen chloride gas causes the liquefied methamphetamine base to form into a substance that can be smoked, snorted, or injected. Coke bottles with fish tank tubing sticking out of them with silicone glue on them are commonly seen during this phase. A rubber tube is placed in the oily liquid and then the gas will begin to bubble and come out of the gas tank.

The mixture begins to solidify and drops to the bottom of the container. The liquid is filtered. The formal name of the substance to be consumed is methamphetamine hydrochloride. The hydrogen chloride gas is a combination of sulphuric acid and table salt. Methamphetamine producers commonly use mobile laboratories to avoid detection.

Gill reviewed the evidence collected and photographs taken of the scene in the instant case. Gill particularly noted the presence of the following items: salt (necessary to create a hydrogen chloride gas), tubing, a large number of tubes, a small micro-bean crusher, a white apparatus (common tool that methamphetamine producers use to grind up tablets), a large number of funnels, a roll of fish-tank tubing, a two-liter bottle with tubing sticking out of it, coffee filters, acid (sulphuric acid is the same ingredient found in a car battery), acetone, paint thinners, several boxes of pseudoephedrine tablets, skillets, and an electric heating element. According to Gill, assuming an off-site reaction with anhydrous ammonia or lithium batteries, the scene herein included the necessities to start and finish methamphetamine production.

During his trial testimony, Detective Liberto further detailed the evidence collected herein. The approximate number of pseudoephedrine tablets (1,231) contained sixty milligrams each. Photographs of the defendant's tattoo, located on his back, were published to the jury. The tattoo was described as follows: "On the left there is a, looks like a skeleton-type individual holding what appears to be the make of an AR-15, with a chef's hat. I would have

to say in the left hand he's holding some kind of glass container of some sort, wearing an apron[.]" The smoke from the weapon spells out the name "Meth Man."

During cross-examination, Detective Liberto testified regarding the renting information for the motel room. According to Detective Liberto, the room was leased by a Larry Ross. No further information regarding the rental of the room or the identity of Larry Ross was obtained. During redirect examination, Detective Liberto responded positively when asked whether the defendant could have checked in the motel room under the alias, Larry Ross.

State witness Stephen Bordelon, an investigator with the St. Tammany Parish District Attorney's office, located digital images on the cellular phone seized from the room. The photographs were downloaded and saved onto a compact disc. The photographs became very unclear after they were enlarged. The CD photos were published to the jury via a laptop computer. Bordelon identified the first photograph as containing a pack of cigarettes and a smoking device. The defendant was also in the photograph. Photographs two through seven depict the defendant inhaling a substance with a smoking device. The eighth photograph depicts a "male individual" (who does not appear to be the defendant) with a smoking device. The ninth photograph depicts the defendant, a table, money, possibly a smoking device, possibly some lighters, and a computer. The final photograph also depicts a smoking device and a computer. During cross-examination, Bordelon confirmed that the date and locations shown in the photographs are unknown. He further confirmed that the existence of illegal behavior couldn't be discerned from the photographs.

Deputy Bulloch also testified during the trial. Deputy Bulloch stated that based on his training, the items observed in plain view upon the officers' forced entry were associated with the production and consumption of methamphetamine. According to Deputy Bulloch, the truck was registered to a Eunie Cavale at the time of the offense.[FN2] This individual was described (based on a Mississippi driver's license) as a white female. She has no identifiable criminal record.

[FN2] According to the search warrant affidavit for the truck, the owner's name is Kvale Unni. (S-65).

Deputy James Folks of the St. Tammany Parish Sheriff's Office Crime Laboratory was called out to execute the search warrant

on the room.  Deputy Folks waited at the scene while a search warrant for the truck was being obtained.  During the execution of the search warrant for the truck, Deputy Folks examined items for potential fingerprints as they were retrieved.  According to Deputy Folks, most of the items of interest were covered with a chemical slime.  He further stated that some of the ingredients that are used to make methamphetamine are toxic and remove the oil (from skin) that leaves prints on surfaces.  Deputy Folks was unable to collect any fingerprints.

Detective Nicky Mistretta of the Slidell Police Department, a member of the St. Tammany Parish Narcotics Task Force at the time of the offense, executed the search warrant for the truck (along with Detective Justin Gibson).  These two detectives were the only individuals in the area certified to conduct the search.  The detectives suited up in protective gear, removed each item from the toolbox, and positioned them on a tarp according to their pH levels.  Specifically, two two-liter Coke bottles containing a clear liquid and a large pickle-type jar containing crushed items in the bottom and liquid on top were removed.  A sample was taken from the items believed to have high PH levels and placed in separate Crime Lab containers for testing.  The items were then photographed, and the cleanup crew collected them.  The Crime Lab containers failed, as the substances destroyed the containers.  According to Detective Mistretta, the containers were not made of the proper type of plastic.  Thus, the samples were never tested.

The defendant testified during the trial as the sole defense witness.  According to the defendant, he lived in Carriere, Mississippi at the time of the offenses.  The defendant worked near Slidell as a contractor with an individual named Larry Ross.  On April 25, 2004, the defendant claimed to be bitten by a spider.  The defendant stated that he may have been bitten multiple times during a two-day period.  After the first bite, his leg became swollen.  The next day he noticed a second bite on the inside of his leg.  The second bite was of a different characteristic than the first observed bite.

The following day, April 26th, the defendant became very ill and was unable to drive back to Mississippi.  Larry Ross drove the defendant to his motel room and allowed the defendant to stay there to recover.  As the defendant was sick at the time, he did not remember the details of the instant arrest.  The defendant reiterated that the room did not belong to him.  The defendant assumed that the items in the room belonged to Larry Ross.  The defendant further explained that Larry Ross used the defendant's vehicle to drive the

defendant to the motel.  Before allowing Larry Ross the use of his vehicle to go back to the work site, the defendant removed his personal items and brought them into the room.  The defendant stated that the truck parked in front of the motel room also did not belong to him and he had never been in the truck.  The defendant did not know Eunie Cavale.  The defendant also stated that he did not provide the false identification that was given to the police officers.  The defendant further stated that the recovered weapons did not belong to him.  The defendant admitted that he was in some of the photographs removed from the cellular phone located at the scene.  The defendant also admitted that a computer seized from the scene belonged to him and that the toolbox seized from the bed of the truck belonged to him.  According to the defendant, he was sick during his stay in the motel room and was unfamiliar with the bulk of the evidence collected at the scene.  The defendant testified that his tattoos were very old and he admitted that he smoked methamphetamines when he was a young member of a motorcycle club.  The defendant stated that during the last few years prior to the trial (the trial took place December 12-December 14, 2005), his health condition, namely, Hepatitis C, prevented him from using methamphetamine.  The defendant was unsure of the location of Larry Ross at the time of the trial.

During cross-examination, the defendant stated that he dated Stacy Ladner off and on since 1996.  During inquiries regarding the defendant's criminal history, the defendant stated that he previously pled guilty to an offense so that charges against Ladner would be dismissed.  When asked whether he was smoking methamphetamine in one of the cellular phone photographs (62-J), the defendant stated as follows, "I don't know.  Can't tell what I was doing.  Could have been smoking tobacco.  The point is, I don't know when the pictures were taken.  They're probably several years old."  The defendant further testified that he did not know who Larry Tucker is.  The defendant suggested that the items seized at the scene belonged to Larry Ross.  When asked why such an amount of Sudafed would be purchased, the defendant responded, "I guess to make meth."

*Count One (creation or operation of a clandestine laboratory)*

La. R.S. 40:983 states, in pertinent part:

A. Creation or operation of a clandestine laboratory for the unlawful manufacture of a controlled dangerous substance is any of the following:

(1) The purchase, sale, distribution, or possession of any material, compound, mixture, preparation, supplies, equipment, or structure with the intent that it be used for the unlawful manufacture of a controlled dangerous substance.

(2) The transportation or arranging for the transportation of any material, compound, mixture, preparation, supplies, or equipment with the intent that such material, compound, mixture, preparation, supplies, or equipment be used for the unlawful manufacture of a controlled dangerous substance.

(3) The distribution of any material, compound, mixture, preparation, equipment, supplies, or products, which material, compound, mixture, preparation, equipment, supplies, or products have been used in, or produced by, the unlawful manufacture of a controlled dangerous substance.

(4) The disposal of any material, compound, mixture, preparation, equipment, supplies, products, or byproducts, which material, compound, mixture, preparation, equipment, supplies, products, or byproducts have been used in, or produced by, the unlawful manufacture of a controlled dangerous substance.

B. It shall be unlawful for any person to knowingly or intentionally create or operate a clandestine laboratory for the unlawful manufacture of a controlled dangerous substance.

La. R.S. 14:27A sets forth the definition of "attempt," stating the following:

Any person who, having a specific intent to commit a crime, does or omits an act for the purpose

of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

We conclude that the evidence more than supports the conviction of the attempted creation or operation of a clandestine laboratory for the unlawful manufacture of methamphetamine. The jury's rejection of the defendant's hypothesis of innocence was reasonable. It is unlikely that the defendant, who admittedly had a history of methamphetamine consumption, would not have observed the items that were upon plain view immediately apparent as part of a clandestine laboratory for the production of methamphetamine. The defendant was in possession of materials, supplies, and equipment necessary for the manufacturing of methamphetamine. Thus, it is evident that the defendant acted for the purpose of and tending directly toward the commission of this offense.

*Count Two (attempted possession with intent to distribute methamphetamine)*

La. R.S. 40:967A provides in pertinent part that it shall be unlawful for any person knowingly or intentionally: (1) To produce, manufacture, distribute, or dispense or possess with intent to produce, manufacture, distribute, or dispense, a controlled dangerous substance or controlled substance analogue classified in Schedule II. Methamphetamine is a Schedule II controlled dangerous substance (CDS). See La. R.S. 40:964 Schedule II C(2). As the defendant was found guilty of attempted possession of methamphetamine with the intent to distribute, the evidence must show that he did or omitted an act for the purpose of and tending directly toward the accomplishing of this offense.

One need not physically possess the controlled dangerous substance to violate the prohibition against possession; constructive possession is sufficient. State v. Gordon, 93-1922, p. 9 (La. App. 1 Cir. 11/10/94), 646 So.2d 995, 1002. A person not in physical possession of the drug is considered to be in constructive possession of a drug when the drug is under that person's dominion and control. Factors to be considered in determining whether a defendant exercised dominion and control sufficient to constitute constructive possession include: (1) the defendant's knowledge that illegal drugs

were in the area; (2) his relations with the person found to be in actual possession; (3) the defendant's access to the area where the drugs were found; (4) evidence of recent drug use by the defendant; and (5) his physical proximity to the drugs.  It is well settled that the mere presence in an area where drugs are located or the mere association with one possessing drugs does not constitute constructive possession.  See State v. Toups, 01-1875, p. 4 (La. 10/15/02), 833 So.2d 910, 913.  A person may be in joint possession of a drug if he willfully and knowingly shares with another the right to control the drug.  Gordon, 93-1922 at p. 9, 646 So.2d at 1002.

In cases where the intent to distribute a CDS is an issue, a court may look to various facts:  (1) whether the defendant ever distributed or attempted to distribute the drug; (2) whether the drug was in a form usually associated with possession for distribution to others; (3) whether the amount of the drug created an inference of an intent to distribute; (4) whether expert or other testimony established that the amount of drug found in the defendant's possession is inconsistent with personal use only; and (5) whether there was any paraphernalia, such as baggies or scales, evidencing an intent to distribute.  State v. House, 325 So.2d 222, 225 (La. 1975).

During the trial, the officers testified that traffic stops were being conducted in the area in question to combat high crime. Herein, the police seized a container of over twelve hundred packs of pseudoephedrine tablets at sixty milligrams each; a scale for weighing drugs; syringes and baggies; chemicals and apparatus associated with the manufacture of methamphetamine; and, an arsenal of weapons and ammunition.  The amount of drugs located at the scene is clearly inconsistent with personal use only.  The defendant argues that he was too sick to notice the presence of the makings of a clandestine laboratory and controlled dangerous substances.  The jury rejected this hypothesis (presented through the defendant's testimony) and we have concluded that such rejection was reasonable.   We conclude that the evidence supports the conviction of attempted possession of methamphetamine with the intent to distribute.

*Count Three (conspiracy to produce and manufacture methamphetamine)*

La. R.S. 14:26A defines criminal conspiracy as follows: ["]Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime;

provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination."  An essential element of the crime of conspiracy is specific intent.  State v. Leger, 04-1467, p. 3 (La. App. 3 Cir. 6/1/05), 907 So.2d 739, 744-745, writ denied, 05-2263 (La. 4/17/06), 926 So.2d 509, cert. denied, 127 U.S.245, 127 S.Ct.245, (2006).  Specific intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequence to follow.  As a question of fact, intent may be inferred from the circumstances of the actions of the offender.  See La. R .S. 14:10(1).  Criminal intent to commit a specific offense must exist in at least two minds.  Leger, 04-1467 at pp. 35-36, 907 So.2d at 763.

Herein, the defendant does not argue that Stacy Ladner obtained the abovementioned items.  Instead, the defendant argues that he was too sick to notice the presence of the items.  As previously stated, the jury reasonably rejected this hypothesis of innocence.  The existence of a relationship between Ladner and the defendant was established during the trial.  During his testimony, the defendant confirmed that a prior indictment charged both him and Ladner with possession of methamphetamines.  According to the defendant's testimony, he entered a guilty plea "so they would drop the charges against her."

Regarding the instant offenses, the defendant's hypothesis offers no explanation for Ladner's presence.  Despite the obvious nature of the environment, Ladner remained in the room.  She initially stated that she was in the room alone.  After admitting there was another occupant, she provided two pieces of false identification.  Thus, Ladner concealed the true identity of herself and the defendant.  Furthermore, Ladner denied the officers entrance to the room by affixing the chain lock.  Based on the instant circumstances, it is reasonable to conclude that criminal intent to commit a specific offense existed in the minds of the two occupants of the room.  By possessing necessary supplies and equipment with the intent that they be used for the unlawful manufacture of methamphetamine, the defendant and Ladner committed an act in furtherance of their object.  We find that the record supports the jury's finding of guilt as to count three.

*Count Four (possession of twelve grams or more of ephedrine, pseudoephedrine, or phenylpropanolamine or their salts, optical isomers, and salts of optical isomers)*

To support a conviction for possession of pseudoephedrine in accordance with La. R.S. 40:962.1.1, the State must present evidence establishing beyond a reasonable doubt that the defendant was in possession of twelve grams or more of pseudoephedrine and that he knowingly and intentionally possessed it.  Guilty knowledge may be inferred from the circumstances.

Upon their entry of the room, the officers herein immediately observed a digital scale, butane torches, pseudoephedrine blister packs, and glass smoking pipes in plain view.  The pseudoephedrine tablets (over 1200 at sixty milligrams each) well exceeded the statutory requirement of twelve grams.  The defendant obviously knew that drugs were in the room and he had complete access to them.  Moreover, a metal "sour candy" tin containing residue was determined to contain methamphetamine.  The evidence clearly supports the conviction on count four.

Based on the above conclusions, viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could reasonably conclude that all of the essential elements of the offenses have been proven beyond a reasonable doubt. Assignment of error number three has no merit.[13]

The Louisiana Supreme Court then likewise denied petitioner's related writ application.[14]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting petitioner's claim unless he shows that the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213

---

[13] Lindsey, 2007 WL 437677, at *3-10; State Rec., Vol. IX of X.

[14] State v. Lindsey, 965 So.2d 397 (La. 2007) (No. 2007-KO-0453); State Rec., Vol. X of X.

F.3d 639 (5th Cir. 2000).  For the following reasons, the Court finds that petitioner has made no such showing.

Under federal law, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added).

Moreover, and particularly important in light of petitioner's argument herein, Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal *habeas corpus* proceedings.  In these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof.  Williams v. Cain, 408 Fed. App'x 817, 821 (5th Cir. 2011); Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992).

Further, the Court cannot accept petitioner's invitation to reassess the credibility of the various witnesses.  Such credibility determinations are the province of the jury at trial, not this Court on collateral review.  See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson [v. Virginia, 443 U.S. 307 (1979)], the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility

choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails to satisfy the Jackson standard for habeas relief."); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

      With those strict principles of review in mind, this Court finds that, for the reasons noted by the state court, the evidence presented in the instant case, when viewed in the light most favorable to the prosecution, was clearly sufficient for any rational trier of fact to find petitioner guilty beyond a reasonable doubt. Therefore, he cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, this Court should defer to the state court's decision rejecting that claim.

Ineffective Assistance of Counsel

      Petitioner next claims that he received ineffective assistance of counsel. The United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel. A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 697 (1984). Petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e.

deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

Petitioner's ineffective assistance of counsel claim was rejected by the state courts in the post-conviction proceedings.[15]  Because such a claim is a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.   Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's

---

[15]  The state district court denied this claim on February 4, 2009.  State Rec., Vol. X of X, Judgment with Reasons for Judgment dated February 4, 2009.  Petitioner's related writ application was then likewise denied by the Louisiana First Circuit Court of Appeal.  State v. Lindsey, No. 2009 KW 0483 (La. App. 1st Cir. Aug. 17, 2009) (unpublished); State Rec., Vol. X of X.  The Louisiana Supreme Court also denied relief.  State ex rel. Lindsey v. State, 46 So.3d 1258 (La. 2010) (No. 2009-KH-2050); State Rec., Vol. X of X.

> specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid</u>.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 785-86 (2011) (citation omitted).  The Supreme Court then explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms,  not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

Id. at 788 (citations omitted; emphasis added).  For the following reasons, the Court finds that, under these stringently deferential standards, it simply cannot be said that relief is warranted in the instant case with respect to petitioner's ineffective assistance of counsel claim.

Petitioner first contends that his trial counsel was ineffective for failing to perform an adequate investigation.  Specifically, petitioner argues that had counsel properly investigated the case he would have discovered that the prosecution did not have the keys to the truck that were used to link petitioner to the incriminating evidence found in the vehicle.

As a preliminary matter, the Court again notes that petitioner has not established his underlying premise, i.e. that the state did not in fact find, take, or retain possession of the keys. Officer Mark Liberto testified under oath at trial that the keys were located inside the hotel room.[16] On the other hand, petitioner simply assumes that the keys must not have been found in the room because they were not listed on various evidence forms or produced at trial.  However, as previously noted, that conclusion does not necessarily follow.

Second, even if one were to assume that the state did not have possession of the keys at the time of trial, that fact is of little consequence.  As noted, the state did not *need* to introduce the actual keys; it could, as it did, establish the presence of the keys in the motel room through Liberto's testimony.  Therefore, even if one further assumes that defense counsel failed to discover that the state no longer had the keys, an assumption which has by no means been proven true, that information was hardly crucial.  The jury was free to, and obviously did, believe Liberto.  There is simply no basis for finding that there was a reasonable probability that, had counsel discovered this

---

[16] State Rec., Vol. III of X, transcript of December 13, 2005, pp. 140-41.

fact, the result of the proceeding would have been different.  With petitioner unable to make that required showing of prejudice, there is likewise no basis for finding that the state court's rejection of this claim constituted an unreasonable application of clearly established federal law.

Petitioner also claims that his counsel was ineffective in the habitual offender proceedings.[17]  Specifically, petitioner argues that counsel should have filed a motion to quash the multiple bill of information and should have objected to the sufficiency of the court's findings. Analysis of this claim is made extremely difficult both by petitioner's complex criminal history and by the errors of the prosecutors and the state courts in this and the prior criminal proceedings. Nevertheless, the Court will attempt to make sense of this morass.

In the multiple bill of information, petitioner was alleged to have ten prior convictions.[18]  However, as he notes, and as the Court will attempt to summarize below, many of those alleged convictions did not actually exist or were otherwise problematic.

First, he was alleged to have been convicted of attempted possession of a firearm by a convicted felon in case number 84320 on December 17, 2002.  That allegation was in fact **true**.[19]

---

[17] This was listed as petitioner's sixth claim in his federal application.

[18] The multiple bill of information appears in Volume I of the state court record.

[19] Petitioner does not challenge the existence of this conviction in his federal application; moreover, he admitted the conviction at trial.  State Rec., Vol. IV of X, transcript of December 14, 2005, p. 87 and 95.

Second, he was alleged to have been convicted of possession of methamphetamine in case number 84450 on December 17, 2002.  That allegation was also **true**.[20]

Third, he was alleged to have been convicted of attempted possession of a firearm by a convicted felon in case number 89-CR1-44551on October 1, 1996.  However, he was not in fact validly convicted of such a crime on that date.  As he notes, the proceedings in case number 89-CR1-44551 were rife with errors.  The bill of information in that case charged him with three counts of being a felon in possession of a firearm.  At trial, he was acquitted on Count 1, convicted on Count 2, and convicted of attempted possession of a firearm by a convicted felon on Count 3.  He was subsequently granted federal *habeas corpus* relief with respect to those two convictions.  Thereafter, he returned to state court on October 1, 1996, where he was allowed to plead guilty to attempted possession of a firearm by a convicted felon on Count 1 (the count on which he had been **acquitted** at trial) and to plead guilty to possession of a firearm by a convicted felon on Count 2.  The state then nolle prossed Count 3.[21]

---

[20] Again, petitioner does not challenge the existence of this conviction in his federal application, and he admitted the conviction at trial.  State Rec., Vol. IV of X, transcript of December 14, 2005, p. 87 and 95-96.

[21] Rec. Doc. 14-1, pp. 43-66.  It is apparent from the transcript and history of the case that this was not what was intended.  Rather, it appears that the prosecutor and judge confused Counts 1 and 3.  The apparent intention was to nolle press Count 1 and allow petitioner to plead guilty to attempted possession of a firearm by a convicted felon on Count 3.  However, as noted, that was not what occurred.

That said, whatever problems existed with respect to petitioner's conviction on Count 1, those same problems did not exist with respect to his conviction on Count 2.  Therefore, although he did not do so, the prosecutor could have included petitioner's conviction on Count **2** in the multiple bill of information.

Fourth, the multiple bill of information alleged that petitioner had been convicted of possession of dihydrocodeine in case number 39592 on February 25, 1985.  That allegation was **true**.[22]

Fifth, the multiple bill of information alleged that petitioner was additionally convicted of possession of codeine in case number 39592 on November 10, 1984.  That allegation is **false**.  As petitioner notes, the records do not reflect a conviction for possession of codeine (which was Count 2 in the original bill of information in case number 39592); instead, they indicate that he was convicted on February 25, 1985, of possession of **dextropropoxyphene** (which was Count 3 in that bill of information).[23]

Sixth, the multiple bill of information alleged that petitioner was convicted of a count of simple burglary in case number 39440 on May 30, 1985.  That allegation was **true**.[24]

Seventh, the multiple bill of information also alleged that petitioner was convicted of a second count of simple burglary in case number 39440 on May 30, 1985.  That allegation was **false**.  That second count was nolle prossed.[25]

---

[22] Rec. Doc. 14-1, pp. 39-42.  The multiple bill of information originally listed the conviction date as November 10, 1989; however, it was later amended to correctly list the conviction date as February 25, 1985.  See State Rec., Vol. I of X, multiple bill of information.

[23] Rec. Doc. 14-1, pp. 39-42.  Petitioner's conviction for possession of dextropropoxyphene was not included in the instant multiple bill of information.

[24] Rec. Doc. 14-1, pp. 20 and 23-38.

[25] Rec. Doc. 14-1, pp. 20 and 25-38.

Eighth, the multiple bill of information alleged that petitioner was convicted of burglary of an inhabited dwelling in case number 39440 on May 30, 1985. That allegation was also **false**, as that count was likewise nolle prossed.[26]

Ninth, the multiple bill of information also alleged that petitioner was convicted of burglary of a pharmacy in case number 39440 on May 30, 1985. That allegation was **false**, as that count was also nolle prossed.[27]

Tenth, the multiple bill of information alleged that petitioner was convicted of another count of simple burglary in case number 39593 on May 30, 1985. That allegation was **true**.[28]

Based on the foregoing, the Court agrees with petitioner's conclusion that counsel should have moved to quash the multiple bill of information due to the numerous errors contained therein. However, even if the Court assumes that counsel's performance was deficient in that respect, that is only half of petitioner's battle; to prevail on his claim, he still must show that prejudice resulted. For the following reasons, he has not made that showing.

Even if counsel had filed such a motion and the multiple bill of information had been successfully quashed, that would have served no purpose other than to delay the habitual offender proceedings because the state could have simply issued a new, proper multiple bill of information. Moreover, from the foregoing, it is clear that petitioner had at least three prior convictions which

---

[26] Rec. Doc. 14-1, pp. 20 and 25-38.

[27] Rec. Doc. 14-1, pp. 20 and 25-38.

[28] Rec. Doc. 14-1, pp. 21 and 25-38.

could properly have been used to adjudicate him as a fourth offender.  Although other combinations of his many prior criminal convictions could be used, the state, for instance, could have issued a multiple bill based on the following three convictions:  possession of methamphetamine in case number 84450 on December 17, 2002; possession of a firearm by a convicted felon in Count **2** in case number 89-CR1-44551 on October 1, 1996; and simple burglary in Count **1** in case number 39440 on May 30, 1985.  That combination would have avoided any of the numerous other problems petitioner raises in his federal application.  For example, inclusion of the conviction in case number 89-CR1-44551 would have solved any problem of linkage to meet the ten-year "cleansing period."[29] Further, because the predicate felony for that conviction was an earlier drug conviction,[30] and because that earlier drug conviction would not also be used in this combination of convictions for enhancement, there would be no "multiple enhancement" problems.[31]  Lastly, because all three of these convictions occurred on different dates, there would be no problem of using multiple convictions occurring on the same date for enhancement purposes.[32]

---

[29] See La.Rev.Stat.Ann. § 15:529.1(C).

[30] See Rec. Doc. 14-1, p. 63.

[31] Although a conviction for being a felon in possession of a firearm conviction normally may be used to enhance the penalty for a subsequent conviction, it may not be used if underlying felony on which the firearm conviction was based is also used as a separate prior offense in the same multiple bill.  See, e.g., State v. Woods, 38 So.3d 391, 409 (La. App. 5th Cir. 2010).

[32] In his application, petitioner argues that multiple convictions which occur on the same date may be counted as only a single predicate offense for enhancement purposes.  However, the law on that point was unclear at the times relevant in this case.  For example, in State ex rel. Mims v. Butler, 601 So.2d 649 (La. 1992), the Louisiana Supreme Court departed from the long-established law and held that multiple convictions occurring on the same date could be counted as only a *single* predicate offense for habitual offender purposes, even when the convictions stemmed from separate and

In light of the foregoing, it is clear that, even if defense counsel had successfully moved to quash the existing multiple bill of information, the state would simply have issued a new, proper multiple bill and the ultimate result would be the same, i.e. petitioner still would have been found to be a fourth offender. Therefore, he has suffered no prejudice resulted from counsel's failure to file such a motion. See Pickney v. Cain, 337 F.3d 542, 546 (5th Cir. 2003); Parker v. Cain, 445 F.Supp.2d 685, 711 (E.D. La. 2006); Varnado v. Cain, Civil Action Nos. 02-1286, 03-753, and 03-754, 2004 WL 2984804, at *6 (E.D. La. Dec. 21, 2004).

Finally, petitioner complains that his counsel did not object when, in the habitual offender proceedings, the trial judge said, without elaboration, that he found petitioner to be a

---

distinct criminal episodes. However, on October 19, 2004, the Louisiana Supreme Court completely changed course again and expressly overruled Mims in State v. Johnson, 884 So.2d 568 (La. 2004). Then, obviously displeased by Johnson, the Louisiana Legislature, on August 15, 2005, enacted Act 218 of 2005, which amended La.Rev.Stat.Ann. § 15:529.1(B) to provide: "Multiple convictions obtained on the same day prior to October 19, 2004, shall be counted as one conviction for the purpose of this Section."

That chronology is particularly problematic considering the facts of this case. Here, petitioner committed the instant offense on April 27, 2004 (after Mims but before Johnson). However, his habitual offender adjudication was not held until April 10, 2006 (after Johnson but before Act 218). It is arguably unclear as to how the law should be applied in those cases, such as this one, where the habitual offender adjudication occurred while Johnson was still good law. The Louisiana Second Circuit Court of Appeal acknowledged as much in State v. Spano, 936 So.2d 304 (La. App. 2nd Cir. 2006), a case involving the same scenario. In Spano, that court held that "[u]ntil we receive contrary instructions from the supreme court or the legislative process, we find that multiple convictions on the same day occurring before 10/19/04 are to be counted as one conviction for purposes of habitual offender adjudications." Id. at 312. However, the court acknowledged that the law was unclear on this point, noting: "We recognize that reasonable differences of opinion as to the correct application of this aspect of the Habitual Offender Law exist." Id. at 312 n.3.

In any event, this Court need not weigh in on how the law was to be applied in such cases, because, as noted, petitioner was legally eligible to be sentenced as a fourth offender even if only convictions occurring on different dates are used.

"multiple offender."[33]  Petitioner points out that the judge should have specifically stated on the record that petitioner was being adjudicated as a "fourth offender."  However, the complaint about this technical error is much ado about nothing.  It is clear that the state was alleging that petitioner was a fourth offender (rather than simply a second or third offender),[34] and it is likewise clear from the context of the hearing that the trial judge found that to be the case.  Moreover, even if counsel had objected to the trial judge's imprecise wording, the judge simply would have clarified the record and expressly noted that he was finding petitioner to be a fourth offender.[35]  Therefore, the result would have been the same, and so petitioner cannot show that he was prejudiced by counsel's failure to make such a motion.

For all of these reasons, the Court finds that petitioner has failed to demonstrate that the state court's decision denying his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, applying the AEDPA's deferential standard, this Court should likewise reject the claim.

---

[33]  State Rec., Vol. IV of X, transcript of April 10, 2006, p. 19; State Rec., Vol. I of X, minute entry dated April 10, 2006.

[34]  See, e.g., State Rec., Vol. IV of X, transcript of April 10, 2006, p. 15 and 18-19; State Rec., Vol. I of X, minute entry dated April 10, 2006.

[35] This Court notes that it was apparent that everyone, including appellate courts on direct review, understood that petitioner was found to be a fourth offender.

<u>Illegal Search and Seizure</u>

Petitioner also claims that the trial court erred in denying a motion to suppress evidence.  Defense counsel filed a motion to suppress,[36] and evidentiary hearings were held on the motion on January 18, 2005,[37] and May 11, 2005.[38]  The motion was then denied on November 7, 2005.[39]  Petitioner thereafter challenged that ruling on direct appeal.  Rejecting the claim, the Louisiana First Circuit Court of Appeal held:

> In his first assignment of error, the defendant argues that his rights were violated as a result of an illegal search.  The defendant contends that the search was based on an uncorroborated, vague, anonymous tip and statements from a pizza deliverer.  The defendant further contends that there was no probable cause to search the motel room.  The defendant argues that the officers seized Ladner without a justifiable reason when they kept her at the door, blocked the only entrance to the room, and forced her to provide identifications.  The defendant also notes that he is eight inches taller than the height description provided in the driver's license upon which his arrest was based.  The defendant further notes that the male in the photograph had hair while the defendant was bald at the time of his arrest.  The defendant concludes that it was obvious that the license did not belong to him and the arrest warrant was faulty.  The defendant argues that the circumstances did not present an exigency and any concerns for Ladner's safety should have been dispelled prior to the officers' entrance into the room.
>
> In the first *pro se* assignment of error, the defendant argues that he (as an overnight guest of the room) and Larry Ross (as the leased dweller of the room) had an expectation of privacy and

---

[36] State Rec., Vol. I of X.

[37] State Rec., Vol. II of X, transcript of January 18, 2005.

[38] State Rec., Vol. II of X, transcript of May 11, 2005.

[39] State Rec., Vol. II of X, transcript of November 7, 2005, p. 2; State Rec., Vol. VIII of X, Judgment with Reasons for Judgment dated November 8, 2005.

protection to be free from unreasonable searches and seizures occurring at the room. The defendant further argues that an arrest warrant would have been sufficient to enter the room if it had been leased to Larry Tucker. The defendant notes that in the absence of exigent circumstances, the officers needed a search warrant to enter the dwelling of a third party to search for the subject of an arrest warrant. The defendant argues that there were no exigent circumstances in this case. The defendant contends that there was no reason for the officers to be concerned about Ladner's safety. The defendant notes that Ladner never indicated that she was in harm's way and that the officers did not question her regarding her safety. The defendant also notes that Ladner informed the officers that the male occupant of the room, the defendant, was sick. The officers briefly observed the defendant and knew that he was in no condition to flee. The defendant further notes that the subject of the arrest warrant was wanted for failure to pay a misdemeanor fine. The defendant also notes that he did not identify himself as Larry Tucker and that there was no evidence that he knew Ladner had provided such identification for him. The defendant contends that the officers did not have a right to be in the room and the exclusionary rule applies to the evidence herein.

In the second *pro se* assignment of error, the defendant argues that the record contains conflicting testimony as to whether the officers actually announced their authority, intent and purpose before entering the room. The defendant contends that there is no evidence or testimony to support the trial court's ruling that the officers complied with the knock and announce provisions of the Fourth Amendment. The defendant cites a recent United States Supreme Court opinion, Hudson v. Michigan, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), wherein the court held that violations of the knock and announce provisions embodied in the Fourth Amendment by officers executing a search warrant did not require the suppression of evidence seized pursuant to a search warrant. The defendant argues that the instant case is distinguishable from Hudson because herein the search warrant was based solely upon plain view observations made subsequent to an illegal entry. The defendant specifically argues that the officers' entry of the room was illegal because they failed to knock and announce their authority and intention to enter and arrest Tucker. The defendant concludes that the trial court erred in denying the motion to suppress the evidence.

The Fourth Amendment to the United States Constitution and Article I, section 5 of the Louisiana Constitution protect persons

– 37 –

against unreasonable searches and seizures.  Subject only to a few well-established exceptions, a search or seizure conducted without a warrant issued upon probable cause is constitutionally prohibited. Once a defendant makes an initial showing that a warrantless search or seizure occurred, the burden of proof shifts to the State to affirmatively show it was justified under one of the narrow exceptions to the rule requiring a search warrant.  La. Code Crim. P. art. 703D; State v. Lowery, 04-0802, p. 6 (La. App. 1 Cir. 12/17/04), 890 So.2d 711, 717, writ denied, 05-0447 (La. 5/13/05), 902 So.2d 1018.  A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained.  La. Code Crim. P. art. 703A.  Although not absolute, the constitutional expectation of privacy from nonconsensual entry and unreasonable searches and seizures extends to guests in a motel room.  Stoner v. State of Cal., 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); State v. Stewart, 27,049, p. 2 (La. App. 2 Cir. 5/10/95), 656 So.2d 677, 679.

An exception to the search warrant requirement exists for items in plain view.  Two conditions must be satisfied to trigger the applicability of the plain view doctrine:  (1) there must be a prior justification for an intrusion into the protected area; and, (2) it must be immediately apparent without close inspection that the items are evidence or contraband.  "Immediately apparent" requires no more than probable cause to associate the property with criminal activity. State v. Howard, 01-1487, p. 8 (La. App. 1 Cir. 3/28/02), 814 So.2d 47, 53.

In State v. Fisher, 97-1133, pp. 4-5 (La. 9/9/98), 720 So.2d 1179, 1182-83, the Louisiana Supreme Court recognized a three-tiered analysis governing the Fourth Amendment's application to interactions between citizens and police.  At the first tier, mere communications between officers and citizens implicate no Fourth Amendment concerns where there is no coercion or detention. United States v. Watson, 953 F.2d 895, 897 n. 1 (5 Cir. 1992); State v. Britton, 93-1990 (La. 1/27/94), 633 So.2d 1208 (per curiam) (noting that police have the same right as any citizen to approach an individual in public).

At the second tier, the investigatory stop recognized by the United States Supreme Court in Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884-85, 20 L.Ed.2d 889 (1968), the police officer may briefly seize a person if the officer has an objectively reasonable suspicion, supported by specific and articulable facts, that the person is, or is about to be, engaged in criminal conduct or is wanted for past

criminal acts. State v. Moreno, 619 So.2d 62, 65 (La. 1993). La.
Code Crim. P. art. 215.1A provides that an officer's reasonable
suspicion of crime allows a limited investigation of a person.
However, reasonable suspicion is "insufficient to justify custodial
interrogation even though the interrogation is investigative." Florida
v. Royer, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229
(1983).

Lastly, at the third tier, a custodial "arrest," the officer must
have "probable cause" to believe that the person has committed a
crime. Watson, 953 F.2d at 897 n. 1; Moreno, 619 So.2d at 65. La.
Code Crim. P. art. 213 uses the phrase "reasonable cause."[FN3] The
"probable cause" or "reasonable cause" needed to make a full
custodial arrest requires more than the "reasonable suspicion" needed
for a brief investigatory stop. See Terry, 392 U.S. at 17-22, 88 S.Ct.
at 1877-80; State v. Flowers, 441 So.2d 707, 712 (La. 1983) (noting
that a less intrusive stop does not require the same "probable cause"
needed for an arrest). When a custodial arrest is made, there is
always some danger that the person arrested may seek to use a
weapon, or that evidence may be concealed or destroyed. To
safeguard himself and others, and to prevent the loss of evidence, it
is reasonable for the arresting officer to conduct a prompt,
warrantless "search of the arrestee's person and the area 'within his
immediate control' – construing that phrase to mean the area from
within which he might gain possession of a weapon or destructible
evidence." U.S. v. Chadwick, 433 U.S. 1, 14, 97 S.Ct. 2476, 2485,
53 L.Ed.2d 538, 550 (1977); Chimel v. California, 395 U.S. 752, 763,
89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

> [FN3] The "reasonable cause" standard of Article
> 213 is equivalent to "probable cause" under the
> general federal constitutional standard. Fisher,
> 97-1133 at p. 5 n. 4, 720 So.2d at 1183 n. 4, (citing
> State v. Weinberg, 364 So.2d 964, 969 (La. 1978)).
> To read Article 213 as allowing an arrest on less than
> probable cause would put the article afoul of the
> Fourth Amendment. Fisher, 97-1133 at p. 5 n. 4, 720
> So.2d at 1183 n. 4.

Probable cause exists when the facts and circumstances within
the affiant's knowledge and of which he has reasonable trustworthy
information are sufficient to support a reasonable belief that an
offense has been committed or that evidence or contraband may be

found at the place to be searched.  State v. Casey, 99-0023, pp. 3-4 (La. 1/26/00), 775 So.2d 1022, 1027-28.  An issuing magistrate must make a practical, common sense decision whether, given all the circumstances set forth in the affidavit, there is a "fair probability" that evidence of a crime will be found in a particular place.  The task of the reviewing court is simply to insure that the magistrate had a "substantial basis" for concluding that probable cause existed. Illinois v. Gates, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).  Probable cause for the issuance of a search warrant does not involve certainties of proof beyond a reasonable doubt, or even a prima facie showing, but rather involves probabilities of human behavior as understood by persons trained in law enforcement and based on the totalities of the circumstances. State v. Rodrigue, 437 So.2d 830, 832-833 (La. 1983).

La.Code Crim. P. art. 224 states as follows:

> In order to make an arrest, a peace officer, who has announced his authority and purpose, may break open an outer or inner door or window of any vehicle, watercraft, aircraft, dwelling or other structure, movable or immovable, where the person to be arrested is or is reasonably believed to be, if he is refused or otherwise obstructed from admittance. The peace officer need not announce his authority and purpose when to do so would imperil the arrest.

The common-law principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is also a command of the Fourth Amendment. Wilson v. Arkansas, 514 U.S. 927, 931-936, 115 S.Ct. 1914, 1916-1919, 131 L.Ed .2d 976 (1995).  It is not necessary to knock and announce when "circumstances presen[t] a threat of physical violence [,]" or if there is "reason to believe that evidence would likely be destroyed if advance notice were given[,]" Wilson, 514 U.S. at 936, 115 S.Ct. at 1919, or if knocking and announcing would be "futile," Richards v. Wisconsin, 520 U.S. 385, 394, 117 S.Ct. 1416, 1421, 137 L.Ed.2d 615 (1997).  The police must have a reasonable suspicion under the particular circumstances that one of these grounds for failing to knock and announce exists.  Hudson, 126 S.Ct. at 2163.[FN4]

[FN4] In an effort to distinguish <u>Hudson v. Michigan</u> from the instant case, the defendant correctly notes that the officers in that case were executing a search warrant at the time of the entry. The court specifically held that the knock-and-announce rule has never protected one's interest in preventing the government from seeing or taking evidence described in a warrant. Nonetheless, the principle regarding the application and exceptions to the knock-and-announcement requirement are applicable to the instant case.

During the motion to suppress hearing, Detective Liberto detailed his brief conversation with the anonymous tipster. The tipster informed Detective Liberto that suspicious activity was taking place in a room at the Slidell Plaza Inn. The motel was in view at the time of the tip. The tipster did not state the room number, but identified the room by pointing to the backside of the motel and stating that it was the "second or third door," and noting that it "wasn't the first one near the hallway." The tipster stated that the room had two occupants and that there was recurrent traffic in and out of the room. Based on the information provided by the tipster, Detective Liberto was interested in the area. Detective Liberto and Deputy Bulloch decided to monitor the area. The officers were traveling in an unmarked police vehicle and wore a visible badge and a vest that bore the word "Sheriff" across the front and back. The officers' attention was specifically directed to Room 130 (seemingly the room designated by the tipster) of the motel when a female occupant made eye contact with them and hurriedly closed her door after completing a transaction with a pizza deliverer. After Detective Liberto flagged down the pizza deliverer, they inquired as to whether he observed any suspicious behavior in the room in question. The pizza deliverer stated that the occupant(s) of the room might be under the influence of something.

The officers knocked on the room door, and conversed with a female occupant. She appeared extremely nervous and provided inconsistent responses when questioned regarding the existence of further occupants. She ultimately provided supposed identification for herself and the male occupant of the room. The officers stated that the identification photographs resembled the occupants of the room. Detective Liberto ran the identifications through the local and national computer on his laptop for detection of any outstanding

warrants.   After an arrest warrant for Larry Lynn Tucker was detected, the dispatcher verified (with the corresponding agency) that the individual was, in fact, wanted.  Such verification was made prior to the attempted execution of the arrest warrant.

In denying the defendant's motion to suppress, the trial court concluded that the officers were reasonable in investigating the complaint of the anonymous tipster.  The court found that questioning the female occupant through the room door was reasonable and proper.   The court further noted that the officers confirmed the attachment before the attempted execution.

We find that no coercion or detention took place prior to the attempted execution of the arrest warrant.  The officers decided to approach the room to speak to its occupants.  Ladner initially spoke to the officers through a closed door and only agreed to a partial opening with continued use of the chain lock.  The officers did not enter the room prior to the confirmation of an arrest warrant for a supposed occupant.  As a matter of fact, according to trial testimony, Deputy Bulloch asked Ladner "if she minded if we come in."  She responded negatively, informing the officers that she would prefer to keep her door chain locked.  The room door remained chain locked during the conversation with Ladner.

Ladner was free to walk away from the door and discontinue the conversation.  Instead, she provided false pieces of identification for the occupants of the room.  Based on the presentation of Ladner and their brief observation of the defendant (despite any discrepancy in height or length of hair between the defendant and the person pictured in the identification) the officers were reasonable in believing that they had been provided with proper identification for the occupants of the room.  The officers had no reason to believe that the occupants were not the lessees of the room.  Conversely, Ladner guarded the entrance of the room as if she were a dweller as opposed to a guest.  The defendant notes inconsistent testimony as to whether the officers announced their authority and purpose before entering the room.  At the motion to suppress hearing, when questioned during direct examination as to the procedure for entering the room, Detective Liberto testified as follows:

> ... I said, 'Hey, we got warrants for you.'  I didn't know what was behind that door at that particular time, and we were kind of telling them, 'Hey, we got something for you,' then making the entry.  If they're in there and they do have some kind of weapon – I

– 42 –

> mean, you want to go in there when their guard is
> somewhat down.  And at that point, I felt that she was
> content with us being there, having that safety of her
> lock on there, so we decided at that point in time to go
> ahead, grab the boltcutters, cut the bolt and make
> entry into the room and effect the arrest.

However, Deputy Bulloch specifically testified that they informed Ladner they had an 'outstanding warrant' and 'wished to effect an arrest on the subject.'  The trial court determined that the officers announced that they were executing the arrest warrant before they entered the room.

When reviewing a trial court's ruling on a motion to suppress based upon findings of fact, great weight is placed upon its determination, because the trial court had the opportunity to observe the witnesses and weigh the relative credibility of their testimony. State v. Parfait, 96-1814, p. 13 (La. App. 1 Cir. 5/9/97), 693 So.2d 1232, 1240.  Even if we were to find that the officers did not comply with the knock-and-announce requirement, as stated in Hudson, it is not always necessary to knock and announce.  The United States Supreme Court requires only that the police have a reasonable suspicion that one of the grounds for failing to knock and announce exists and has acknowledged that this "showing is not high." Hudson, 126 S.Ct. at 2163.

Although Ladner did not specifically state that she was in danger, based on her behavior (including nervousness and inconsistent answers as to whether there were any co-occupants) and the statements made by the tipster and the pizza deliverer, the officers were reasonable in suspecting that the situation may pose a danger or that evidence could be disposed of as a result of an announcement. We find that the officers' brief observation (prior to their entry) of the defendant's condition was insufficient to dispel such safety concerns. Thus, the entry of the room was proper and the search warrants were based on information obtained and observations made during reasonable investigatory procedures.   The evidence was seized pursuant to the search warrants.  We find no abuse of discretion in the trial court's denial of the defendant's motion to suppress.  This assignment of error lacks merit.[40]

---

[40] Lindsey, 2007 WL 437677, at *11-16; State Rec., Vol. IX of X.

The Louisiana Supreme Court then likewise denied petitioner's related writ application.[41]

Petitioner now asks this Court to second-guess the state court's decision on his Fourth Amendment claim. The Court cannot oblige. The United States Supreme Court has held: "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial." Stone v. Powell, 428 U.S. 465, 494 (1976) (footnote omitted); see also Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002). The Stone bar applies even if the state court rulings regarding the Fourth Amendment claim were in fact erroneous. Swicegood v. Alabama, 577 F.2d 1322, 1324 (5th Cir. 1978).

Petitioner tries to avoid application of the Stone bar by arguing that his Fourth Amendment claim was not "fully litigated" due to errors made by the state courts. However, it would be of no consequence even if such an error in fact occurred. Interpreting Stone, the United States Fifth Circuit Court of Appeals has clearly held:

> An "opportunity for full and fair litigation" means just that: an *opportunity*. If a state provides the *processes* whereby a defendant *can* obtain full and fair litigation of a fourth amendment claim, Stone v. Powell bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes.

Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978) (emphasis added). The Court of Appeals subsequently noted that the same rule applies even where a defendant in a particular case does attempt to litigate a Fourth Amendment claim but the state court erroneously refuses to consider that claim, holding:

---

[41] State v. Lindsey, 965 So.2d 397 (La. 2007) (No. 2007-KO-0453); State Rec., Vol. X of X.

> [I]n the absence of allegations that the *processes* provided by a state
> to fully and fairly litigate fourth amendment claims are *routinely or
> systematically* applied in such a way to prevent the actual litigation
> of fourth amendment claims on the merits, the rational of <u>Caver</u>
> dictates that <u>Swicegood</u>'s application of <u>Stone</u> despite a mistake in
> adjudicating the merits must apply with equal force to procedural
> mistakes that thwart the presentation of fourth amendment claims.

<u>Williams v. Brown</u>, 609 F.2d 216, 220 (5th Cir. 1980) (emphasis added); <u>see also</u> <u>Janecka</u>, 301 F.3d

at 321 ("[A]bsent additional allegations that state processes routinely or systematically are applied

in such a way as to prevent the actual litigation of Fourth Amendment claims, mistakes that thwart

the presentation of Fourth Amendment claims do not render the <u>Stone</u> bar inapplicable.").

It is beyond cavil that Louisiana courts provide criminal defendants the opportunity to raise

Fourth Amendment claims.  Indeed, petitioner clearly availed himself of those state processes for

review of such claims.  Where, as here, there is no evidence showing that the state processes are

*routinely or systematically* applied in such a way as to prevent the actual litigation of such claims,

the <u>Stone</u> bar applies.  Accordingly, this Court may not review petitioner's Fourth Amendment

claim.

<u>Abridgement of the Right to Appeal</u>

Lastly, petitioner claims his appellate rights were abridged by the Louisiana First Circuit

Court of Appeal.  Specifically, he contends that the Court of Appeal violated his rights by

misstating the facts of the case, improperly considering evidence not admitted at trial, and failing

to address every claim asserted on appeal.

As petitioner acknowledges, it is well settled that there is no constitutional right to an appeal

in a criminal case.  More than a century ago, the United States Supreme Court held: "A review by

an appellate court of the final judgment in a criminal case, however grave the offense of which the accused is convicted, was not at common law, and is not now, a necessary element of due process of law. It is wholly within the discretion of the state to allow or not to allow such a review." McKane v. Durston, 153 U.S. 684, 687 (1894); see also Smith v. Robbins, 528 U.S. 259, 270 n.5 (2000) ("The Constitution does not, however, require States to create appellate review in the first place."); Ross v. Moffitt, 417 U.S. 600, 606 (1974) ("[A] State is not obliged to provide any appeal at all for criminal defendants.").  "Nonetheless, if a State has created appellate courts as an integral part of the system for finally adjudicating the guilt or innocence of a defendant, the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." Evitts v. Lucey, 469 U.S. 387, 393 (1985) (citation, quotation marks, and ellipsis omitted).  Louisiana has in fact established such a right under state law.  La. Const. art. I, § 19 ("No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based."); La.C.Cr.P. art. 912.1; State v. Arceneaux, 983 So.2d 148, 150 (La. App. 5th Cir. 2008) ("There is a constitutional right in Louisiana to an appeal.").

That said, the administration of justice is rarely perfect, and errors are committed by appellate courts just as they are by trial courts.  However, relief from such errors must normally be found on direct review.  In the instant case, the Louisiana Supreme Court reviewed the Louisiana First Circuit Court's judgment and found no such errors.

Petitioner now essentially asks this Court to provide appellate review of the Louisiana Supreme Court's decision.  That is not our role.  A federal *habeas* court does not sit to ensure that

perfect justice was done or that state courts' decision-making was free from all errors.  Instead, "[f]ederal review of state convictions is confined to the very narrow standard of due process," and "before a federal court may overturn a state conviction, it must first find an error that amounts to a failure to observe that fundamental fairness essential to the very concept of justice."  Trussell v. Estelle, 699 F.2d 256, 259 (5th Cir. 1983) (quotation marks omitted).  For the following reasons, the purported errors identified by petitioner simply did not render his appellate review so fundamentally unfair as to violate due process.

Petitioner first complains that the Court of Appeal misstated some of the facts of the case.  For example, he notes that the Court of Appeal stated that some items of evidence were found in the portable toolbox when they actually were found in the truck.  However, that is of no moment, because petitioner had dominion and control over *both* the toolbox *and* the truck.[42]  Petitioner also notes that at one point the Court of Appeal made a reference in its opinion to "over twelve hundred packs of pseudoephedrine"[43] when actually what was found was over twelve hundred pseudoephedrine *tablets*.  It is nevertheless clear that this was a simple misstatement.  The Court of Appeal was aware that it was over twelve hundred tablets (not packs) of pseudoephedrine, in that it noted as much on at least three occasions elsewhere in the opinion.[44]

---

[42] The Court notes that, again, petitioner argues that the state failed to prove that he had dominion and control over the truck because the keys were not produced at trial.  As previously noted in this opinion, the Court rejects that argument.

[43] Lindsey, 2007 WL 437677, at *9.

[44] Id. at *3, 5, and 10.

Petitioner next contends that the Court of Appeal considered state exhibits which were not introduced and admitted into evidence at trial.  As the state notes in its response in this proceeding, that contention is refuted by the state court record which shows that the state exhibits were in fact introduced and admitted into evidence.

Petitioner also complains that the Court of Appeal failed to address one facet of his multi-faceted Fourth Amendment claim.  As noted previously in this opinion, the Court of Appeal examined in detail whether petitioner's Fourth Amendment rights were violated and found no such violation.  Just because the Court of Appeal failed to expressly discuss one facet of his claim does not mean that the Court of Appeal failed to consider it.  While petitioner would have preferred a detailed, written explanation as to why each facet of every claim was rejected, the federal constitution does not require that appellate courts satisfy such desires.  On the contrary, an appellate court is not required to issue a written opinion *at all*.  See, e.g., Taylor v. McKeithen, 407 U.S. 191, 194 n.4 (1972); White v. Scott, No. 97-6258, 1998 WL 165162, at *1 (10th Cir. Apr. 9, 1998); King v. Champion, 55 F.3d 522, 526 (10th Cir. 1995); Furman v. United States, 720 F.2d 263, 264 (2nd Cir. 1983); United States v. Baynes, 548 F.2d 481 (3rd Cir. 1977); Jones v. United States, No. 88 CIV. 3999, 1990 WL 6566, at *3 (S.D.N.Y. Jan. 24, 1990).  Necessarily, then, an appellate court certainly does not violate a litigant's right to due process simply by failing to expressly provide its reasoning on every facet of every issue raised by a litigant.

Accordingly, for all of these reasons, this claim should be rejected.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition of **John S. Lindsey** for federal *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[45]

New Orleans, Louisiana, this seventh day of July, 2011.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

---

[45] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.